**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| RITA BOUCHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:13-cv-01585-TWP-DKL |
| | ) | |
| UNITED STATES DEPARTMENT OF | ) | |
| AGRICULTURE, and | ) | |
| TOM  VILSACK on behalf of UNITED | ) | |
| STATES DEPARTMENT OF | ) | |
| AGRICULTURE, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

This matter is before the Court on the parties' Cross-Motions for Summary Judgment. Plaintiff Rita Boucher ("Ms. Boucher") filed this lawsuit to appeal a final determination of the United States Department of Agriculture ("USDA") after USDA determined that portions of her farmland property were wetlands and converted wetlands, thereby jeopardizing certain economic benefits. Ms. Boucher sought administrative relief through USDA's administrative appeals process. At the conclusion of that process, USDA made a final determination against Ms. Boucher and this lawsuit for judicial review followed.

In her Complaint, Ms. Boucher requests declaratory relief under the Administrative Procedure Act, 5 U.S.C. § 706, that the USDA's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; were in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; were without observance of procedure required by law; and were unsupported by substantial evidence. Ms. Boucher requests remand to the USDA with instructions that they complete another investigation of the property and determine that the

removal of trees does not make the property ineligible for farm program benefits. The parties filed cross motions for summary judgment on the Complaint. For the following reasons, the Court **DENIES** Ms. Boucher's Motion for Summary Judgment (Filing No. 44) and **GRANTS** USDA's Cross-Motion for Summary Judgment (Filing No. 48).

## I.   BACKGROUND

### A.   "Swampbuster" Provisions of the Food Security Act of 1985

As part of the Food Security Act of 1985, Congress enacted the Wetland Conservation provisions, commonly known as the "Swampbuster" provisions, in an effort to protect wetlands that were being lost to farming activity (*see* 16 U.S.C. §§ 3801, 3821–24). Part 12 of Title 7 of the Code of Federal Regulations provides the implementing regulations for the Swampbuster provisions, which require all agricultural producers to protect the wetlands on the farms that they own or operate if they want to be eligible for USDA farm program benefits.  Specifically, limitations are placed on farm program benefit eligibility for individuals who conduct farming activities on converted wetlands or who convert wetlands for agricultural purposes. 16 U.S.C. § 3821.

A wetland is defined as land that "(1) has a predominance of hydric soils; (2) is inundated or saturated by surface or groundwater at a frequency and duration sufficient to support a prevalence of hydrophytic vegetation typically adapted for life in saturated soil conditions; and (3) under normal circumstances does support a prevalence of such vegetation . . . ." 7 C.F.R. § 12.2(a). A converted wetland is:

> a wetland that has been drained, dredged, filled, leveled, or otherwise manipulated (including the removal of woody vegetation or any activity that results in impairing or reducing the flow and circulation of water) for the purpose of or to have the effect of making possible the production of an agricultural commodity without further application of the manipulations described herein if:
>> (i) Such production would not have been possible but for such action, and

> (ii) Before such action such land was wetland, farmed wetland, or farmed-wetland pasture and was neither highly erodible land nor highly erodible cropland.

7 C.F.R. § 12.2(a)(3).

The USDA offers farm program benefits, such as commodity adjustments, disaster payments, federal loans, and insurance programs, to individuals engaged in agricultural activities. However, these individuals must demonstrate their eligibility to receive these benefits. A part of the eligibility process is wetlands conservation compliance.

A person may become ineligible for all or a portion of USDA's farm program benefits if that person farms on wetlands that were converted after December 23, 1985, or if the person converts wetlands for agricultural use after November 1, 1990. 7 C.F.R. § 12.4. Some exemptions apply to the Swampbuster provisions to allow farmers to maintain farm program benefit eligibility. Eligibility will remain intact under the following circumstances. "As the result of the production of an agricultural commodity on the following lands: A converted wetland if the conversion of the wetland was commenced before December 23, 1985. . . ." 16 U.S.C. § 3822(b)(1)(A). Benefit eligibility also will remain for the conversion of the following:

> A wetland on which the owner or operator of a farm or ranch uses normal cropping or ranching practices to produce an agricultural commodity in a manner that is consistent for the area where the production is possible as a result of a natural condition, such as drought, and is without action by the producer that destroys a natural wetland characteristic. . . .

16 U.S.C. § 3822(b)(2)(C).

The Natural Resources Conservation Service ("NRCS"), an agency of USDA, is tasked with conserving, maintaining, and improving the country's natural resources and environment. The Farm Service Agency ("FSA"), another agency of USDA, implements agricultural policy and administers farm commodity, crop insurance, credit, environmental, conservation, and emergency

assistance programs for farmers. NRCS and FSA are involved in enforcing compliance with agricultural rules and regulations, and FSA determines compliance and the resulting farm benefits eligibility. FSA acts through state and county office committees. As a scientific agency, NRCS makes technical determinations about whether wetlands exist or have been converted. NRCS also investigates reports of noncompliance with the Swampbuster provisions. To assist in making wetlands determinations, NRCS is directed to develop and utilize off-site and on-site wetlands identification procedures. Therefore, NRCS developed and relies on several technical manuals and publications that describe the scientific procedures NRCS must follow when making a wetland determination.

**B.  Factual and Procedural Background**

Ms. Boucher resides in Skidmore, Missouri, and she owns real property located in Hancock County, Indiana (the "Property"). The Property has been utilized continuously as a farmstead for the production of livestock and grain for more than 150 years. Ms. Boucher and her late husband, David Boucher ("Mr. Boucher"), have owned the Property or otherwise been involved with it since at least the 1980s.  Ms. Boucher rents out the Property (farm #5309, tract #813) to other individuals who use the land for farming purposes such as growing crops and raising livestock. The individual tenants who have conducted farming activities on the Property have received economic benefits through USDA's farming programs. As noted above, in order to qualify for these benefits, certain requirements must be met and maintained at the Property, including wetlands conservation activities to preserve existing wetlands.

In 1987, Mr. Boucher was notified the Property might be classified as wetlands because of the presence of hydric soils. In 1991, Mr. Boucher was notified of a non-certified determination of potential wetlands, prior converted wetlands, and converted wetlands on the Property. In 1994,

4

Mr. Boucher noticed that passersby were dumping garbage on the Property in Field Un2. In hopes to deter further dumping, Mr. Boucher cleaned up the garbage, cleared brush, and removed five trees. A few years later, he removed four additional trees. In total, Mr. Boucher removed nine trees from Fields Un1 and Un2.

On March 15, 2002, NRCS received a "conservation reserve program" request from FSA for the Property, and NRCS scheduled a field visit. On June 7, 2002, a representative from NRCS conducted the field visit with Gary Kingen, the tenant and farm operator at the Property. Because a potential wetland violation had been reported, on July 16, 2002, FSA asked NRCS to make a determination whether a wetland area on the Property was improperly converted after November 28, 1990. Mr. Boucher disputed that the Property contained wetlands or that wetland violations had occurred, so on July 29, 2002, he and the farm operator (Gary Kingen) submitted a "request for a certified wetland determination" to NRCS. They asked that NRCS determine whether an area being cropped on the Property that previously was determined to be wetlands or converted wetlands was in fact wetlands or converted wetlands.

In October 2002, NRCS completed a "routine wetland determination" and found that all three criteria for wetlands—hydric soils, hydrophytic vegetation, and hydrology—were present at the Property. To determine hydrophytic vegetation, NRCS used a similar adjacent property (which is permissible under the regulations) because the Property already had been cleared and cropped. However, no "atypical situation data sheet" was prepared at that time to explain why a comparison property was necessary. NRCS sent a letter dated February 7, 2003, to Mr. Boucher to notify him that a preliminary technical determination had been made concerning the Property. It was determined that the Property had 2.8 acres of converted wetlands on Field Un1 and 1.6 acres of wetlands on Field Un2. This letter also informed Mr. Boucher of his appeal rights. Mr. Boucher

requested reconsideration of the determination and also asked for a site visit at the Property. Two separate site visits were scheduled and then canceled during February 2003 because of poor weather conditions. By letter dated March 4, 2003, Mr. Boucher provided written notice to NRCS that he was appealing the preliminary wetland determination and requested a field visit. He asserted that the appeal of the wetland determination was based on a technical error made by NRCS.

On March 19, 2003, a conservationist with NRCS conducted a field visit of the Property with Mr. Boucher and Gary Kingen. They discussed the Food Security Act rules on wetlands and the wetland characteristics of the Property. However, they did not walk throughout the Property or take any soil samples. Mr. Boucher and Gary Kingen were informed that they would not have to worry about complying with the wetland rules if they chose not to participate in USDA farm benefit programs. They agreed to consider a remediation plan if one was provided by NRCS. No changes were made to the preliminary wetland determination based on this field visit.

On April 17, 2003, Mr. Boucher, through an attorney, submitted a written appeal of the preliminary wetland determination to the county office of FSA, requesting a review by the state conservationist. The letter asserted that the March 19, 2003 field visit was inadequate. In July 2003, the FSA county committee met with Mr. Boucher to discuss his appeal of the preliminary wetland determination. Then on July 22, 2003, an FSA county representative forwarded Mr. Boucher's appeal to the state conservationist and requested a written technical determination for the Property within thirty days.

NRCS sent slides of the Property to the state conservationist on August 13, 2003, to assist in the field review. On August 15, 2003, Mr. Boucher sent a letter to his attorney informing him that a meeting with the state conservationist had been set up to occur in September 2003. On

6

September 5, 2003, the district conservationist with NRCS notified the state conservationist that he should contact the local conservationist who conducted the March 19, 2003 field visit because she had the file for the Property. The state conservationist's technical staff were scheduled to make a site visit on September 6, 2003; however, no record or documentation exists to show that this site visit ever took place. A certified final wetland determination was not issued to the Bouchers. Sadly, Mr. Boucher died in February 2004.

On July 2, 2012, approximately nine years after the state conservationist's site visit was supposed to occur, a new tenant and farm operator at the Property, Raymond Helms ("Mr. Helms"), submitted a "highly erodible land conversation and wetland conservation certification" to FSA. Mr. Helms made a request to FSA to remove an old house and barn from Field 8 so that he could farm the land. On September 11, 2012, FSA referred the wetland conservation certification to NRCS. On October 23, 2012, NRCS returned the certification to FSA, noting the 2.8 acres of converted wetlands on Field Un1 based on the February 7, 2003 records and preliminary determination. However, FSA would not accept the certification because there was no support documentation showing that a final determination had ever been issued by the state conservationist.

On November 19, 2012, NRCS's district conservationist discovered that the state office never completed a certified final technical determination of the Property. In early December 2012, NRCS and FSA agreed that a field visit of the Property should be conducted so that a certified final determination could be made. Between December 12, 26, and 29, a total of sixteen inches of snow fell on the Property. The Property held eleven inches of snow in early January 2013. On January 13, 2013, two inches of rain fell on the Property. Then on January 14, 2013, NRCS conducted its field visit of the Property. A district conservationist, a soil scientist, and an area

easement specialist conducted the review. They took photographs of the fields at the Property and also took soil samples. They verified the findings from the preliminary determination made in 2003 and concurred with those findings. NRCS sent a letter dated January 30, 2013, to Mr. Helms, informing him that a preliminary technical determination had been made and that it superseded any previous determinations. The letter noted that Field 8 was consider a "non-wetland," and it informed Mr. Helms of his appeal rights.

On March 1, 2013, NRCS's state conservationist sent the certified final technical determination for the Property to Mr. Helms. The letter referenced the 2003 preliminary determination and the January 2013 state conservationist site visit. It noted that the site visit supported the 2003 findings of hydric soils, hydrophytic vegetation, and hydrology at the Property. The letter also noted that Field 7 was used as a comparison site to make determinations regarding Fields Un1 and Un2 because those fields had been modified from their original, natural state. The letter explained that it was determined Field 8 was a non-wetland, Field 7 had 1.3 acres of wetland, Field Un1 had 0.7 acres of converted wetlands, and Field Un2 had 1.9 acres of converted wetlands. At the request of Mr. Helms, on March 27, 2013, NRCS's state conservationist sent a follow-up notification of the certified final technical determination to Ms. Boucher and extended the appeal deadline to April 30, 2013.

On April 13, 2013, Ms. Boucher appealed the final technical determination to USDA's National Appeals Division. In her appeal, she raised six reasons why the wetlands determination regarding Fields Un1 and Un2 was erroneous. First, the drainage in the two fields was enhanced by drainage tile that was installed prior to 1985 and the Food Security Act, thereby exempting any prior wetland conversion. Second, the fields were not abandoned areas because of wetland characteristics, and the fields were being used as pastures, unlike the comparison site, Field 7,

8

which was not being used. Third, the trees and vegetation removed from the fields were not dispositive indicators of a wetland because the trees and vegetation identified were from Field 7. Fourth, Field 7 was an improper comparison site for the fields because the existing drainage tile in the adjacent prior converted area of Field 1 would have made that area more similar regarding soil hydrology for comparison to the fields. Fifth, the report from the October 2002 site review noted free water and depth of saturation greater than twelve inches, yet no free water or saturation levels were found or documented. And sixth, no primary indicators were noted under the "wetland hydrology indicators," only secondary indicators, and the secondary indicators were not valid.

In response to a request from the National Appeals Division, Ms. Boucher sent additional documentation on April 19, 2013. She also alleged an additional error in the certified final technical determination—it was in error or otherwise null and void because of NRCS's failure to timely address Mr. Boucher's 2003 appeal.

On May 3, 2013, NRCS prepared an "atypical situation data sheet" to explain why a comparison site (Field 7) was necessary to make a determination for Fields Un1 and Un2. NRCS asserted that because Fields Un1 and Un2 had been manipulated to allow crop production and trees had been removed, a comparison site was necessary to determine whether wetland characteristics would have been present absent the manipulations and tree removal. This comparison was done consistent with USDA regulations and technical manuals.

On May 17, 2013, Mr. Helms unearthed a piece of broken drainage tile in the field just northeast of Field Un1. Before the administrative hearing took place, Ms. Boucher hired B. Thompson Associates to perform excavation work in Fields Un1 and Un2. This work was done to determine the soil hydrology and drainage. On May 31, 2013, B. Thompson Associates trenched the fields in a cross pattern going through the center of each field at a depth of five and a half feet

and a width of nine inches. In conducting this excavation work, B. Thompson Associates discovered no drainage tiles. They explained that it was evident that drainage tile had never been installed in Fields Un1 and Un2.

Leading up to the appeals hearing, the hearing officer at USDA's National Appeals Division, B. Dale Hicks ("Mr. Hicks"), received documents concerning the wetlands determination from Ms. Boucher and from NRCS. A pre-hearing conference was held, discovery was permitted, and then a hearing on the appeal was conducted on June 20, 2013. Mr. Hicks conducted the hearing, heard testimony and argument from both sides and received exhibits. Mr. Hicks then issued an "appeal determination" on July 12, 2013, affirming the certified final technical determination of NRCS.

On August 13, 2013, Ms. Boucher appealed the hearing officer's decision and requested a "Director Review" from the National Appeals Division. The Director reviewed the case record, the hearing transcript, the appeal determination from Mr. Hicks, Ms. Boucher's request for Director review, NRCS's response to Ms. Boucher's request for Director review, and the applicable laws and regulations. After reviewing these things and considering the facts, arguments, and regulations, the Director determined that Ms. Boucher had not proven by a preponderance of the evidence that the decisions below were erroneous. The Director concurred with the determinations regarding wetlands and converted wetlands on the Property.

On October 3, 2013, Ms. Boucher initiated this lawsuit, seeking judicial review of the administrative decision of USDA. She requests declaratory relief under the Administrative Procedure Act that USDA's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; were in excess of statutory jurisdiction, authority, or limitations, or

10

short of statutory right; were without observance of procedure required by law; and were unsupported by substantial evidence.

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion

11

for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the Court's] review of the record requires that [the Court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

### III.   STANDARD OF REVIEW OF ADMINISTRATIVE DECISIONS

In the context of administrative actions and decisions, the Administrative Procedure Act requires a plaintiff to exhaust all available administrative remedies before initiating an action in federal court. 5 U.S.C. § 704. Summary judgment is appropriate in cases where the court's task is to review an administrative record and apply legal standards to that record. *See Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir. 1994). Under the Administrative Procedure Act, a district court may set aside a final agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496–97 (2004). Under the Administrative Procedure Act, a district court also may set aside a final agency action if it is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; is without observance of procedure required by law; or is unsupported by substantial evidence. 5 U.S.C. § 706(2).

The Court's review focuses on whether "the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Indiana Forest Alliance, Inc. v. United States Forest Serv*., 325 F.3d 851, 859 (7th Cir. 2003) (citation and quotation marks omitted). On review, the district court does not reweigh the evidence that was presented to the agency, and thus, the review is narrow and highly deferential. *Israel v. USDA*, 282 F.3d 521, 526 (7th Cir. 2002). "[E]ven if we disagree with the agency's action, we must uphold the action if the agency considered all of the relevant factors and we can discern a rational basis for the agency's choice." *Id.* The district court is not empowered to substitute its judgment for that of the agency but rather ensures that there is a rational connection between the facts found and the choice made by the agency. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). "Even when an agency explains its decision with less than ideal clarity, a reviewing court will not upset the decision on that account if the agency's path may reasonably be discerned." *Alaska Dep't of Envtl. Conservation*, 540 U.S. at 497 (citation and quotation marks omitted).

Where resolution of the dispute involves primarily issues of fact requiring a high level of technical expertise, the district court gives substantial deference to the federal agencies. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989). The district court also gives "substantial deference to an agency's interpretation of its own regulations." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).

A plaintiff challenging an agency's action bears the burden of demonstrating that the agency's action fails under the Administrative Procedure Act. *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995). Despite the high hurdle a plaintiff faces and the substantial deference given to federal agencies, "deference does not mean obeisance. Deference will not shield an agency

action from a thorough, probing, in-depth review." *Id.* (citation and quotation marks omitted). "[N]arrow and deferential review does not equate with no review at all. The inquiry still must be thorough and probing." *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir. 1996). An agency's decision is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence, or is implausible. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## IV.  DISCUSSION

Ms. Boucher asserts that USDA's action—determining that wetlands and converted wetlands exist on the Property—was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; was in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; was without observance of procedure required by law; and was unsupported by substantial evidence. She challenges USDA's determination that Field 7 has wetlands and Fields Un1 and Un2 have converted wetlands. Ms. Boucher provides four bases for her assertion that USDA's decision should be vacated and remanded: (1) Fields Un1 and Un2 are exempt from the Swampbuster provisions because they were converted before the enactment of the provisions in 1985 and because no action was taken to make the production of agricultural commodities possible; (2) Fields Un1 and Un2 do not meet the criteria for hydrology and hydrophytic vegetation and therefore do not qualify as wetlands; (3) Field 7 was improperly used as the comparison or reference site for Fields Un1 and Un2; and (4) NRCS's decision is void and unenforceable because of NRCS's failure to timely finalize Mr. Boucher's 2003 appeal. The Court will address each contention in turn.

### A.  Exemptions from the Swampbuster Provisions

The Swampbuster provisions do not apply to farming activities on converted wetlands if the conversion of the wetland was commenced before December 23, 1985. Additionally, the Swampbuster provisions do not apply to the conversion of a wetland where normal cropping or ranching practices are used to produce an agricultural commodity in a manner that is consistent for the area, where the production is possible as a result of a natural condition, and where there is no action by the producer that destroys a natural wetland characteristic. Ms. Boucher asserts that these exemptions apply because Fields Un1 and Un2 were converted before December 23, 1985, and because no action was taken to make the production of agricultural commodities possible as such production already was possible using normal farming practices.

In its March 1, 2013 final technical determination of the Property, NRCS explained that drainage tile had been added to Fields Un1 and Un2 thus necessitating the use of a comparison site for the final determination. When Ms. Boucher appealed the wetlands determination to the National Appeals Division on April 13, 2013, she argued that the drainage tiles were installed prior to 1985, so the fields should have been exempt from the Swampbuster provisions under the prior converted wetland exemption.

Prior to the appeal hearing, Ms. Boucher had the fields trenched in late May 2013. This excavation work revealed that drainage tiles were not installed in Fields Un1 and Un2.  During the appeal hearing, Ms. Boucher argued that drainage tile was not present in Fields Un1 and Un2 and the few tiles found in other locations pre-dated 1985. NRCS did not dispute that drainage tile was not present in Fields Un1 and Un2 but rather focused its argument on the fact that trees had been removed thereby converting the wetlands.

Now Ms. Boucher argues to this Court that tiles were in fact present and installed before 1985, and the fields were converted wetlands before 1985 because of the installation of the tiles.

Thus, the Swampbuster provisions do not apply. USDA explains that the presence of any drainage tiles and when they would have been installed is not helpful to Ms. Boucher's argument because the determination that wetlands were converted was based on the removal of trees in the 1990s. USDA also asserts that Ms. Boucher waived the prior converted wetland exemption by not raising it during the administrative proceedings. The Court notes that Ms. Boucher presented this argument in her April 13, 2013 appeal to the National Appeals Division.

Ms. Boucher argues that the only evidence before USDA's hearing officer was the testimony that drainage tiles would have been installed at the Property before 1985, and as a result, the Property was a prior converted wetland before the Swampbuster provisions were enacted, thereby exempting the Property from the provisions. However, Ms. Boucher's argument ignores the other evidence that she herself presented during the administrative proceedings. Ms. Boucher hired B. Thompson Associates to trench Fields Un1 and Un2 in a cross pattern going through the center of each field at a depth of five and a half feet and a width of nine inches. In conducting this excavation work, B. Thompson Associates discovered no drainage tiles. They explained that it was evident that drainage tile had never been installed in Fields Un1 and Un2. The photographs and map of drainage tile showed only minimal tiles (three tiles) in an adjacent field. The testimony presented was that any tile that may have been at the Property likely would have been pre-1985 vintage, but there was no drainage tile added to Fields Un1 and Un2 (Filing No. 44-2 at 28–29). Thus, the evidence before USDA's adjudicators indicated that there may have been tile in some locations on the Property, and there was no tile in Fields Un1 and Un2. The administrative decision by USDA is consistent with this evidence, and the Court is not allowed to reweigh the evidence on judicial review of an administrative decision.

Ms. Boucher also asserts that the Property is exempt from the Swampbuster provisions because no action was taken to make the production of agricultural commodities possible since production was already possible using normal farming practices and because the purpose of removing the trees from the fields was to clean up the fields, not to farm them. Ms. Boucher points to evidence that portions of Fields Un1 and Un2 were being farmed and farming activities were possible without the removal of the trees by simply farming around the trees. She also explains that Mr. Boucher removed the trees in order to clean up the fields in hopes that passersby would not use the Property as a dumping ground. Thus, the removal of the trees was not "for the purpose of or to have the effect of making possible the production of an agricultural commodity." 7 C.F.R. § 12.2(a)(3).

USDA responds that it is undisputed that Mr. Boucher removed woody vegetation (*i.e.*, trees) from Fields Un1 and Un2 in the 1990s. USDA points out that Mr. Boucher's subjective intent for removing the trees is not determinative under the rules and regulations, and Ms. Boucher's argument ignores the second part of the regulatory language: "or to have the effect of making possible the production of an agricultural commodity." Regardless of Mr. Boucher's intent to remove trees for aesthetic reasons, the manipulation of the land by removing trees had the effect of making possible the production of an agricultural commodity where the trees once stood. The Bouchers admitted to removing at least nine trees and other brush from the fields, and NRCS showed that the removal made farming possible on the areas where this vegetation once existed. Again, the administrative decision by USDA is consistent with the evidence and is not arbitrary or capricious. Therefore, Ms. Boucher's arguments are unavailing concerning the prior converted wetland exemption and the possibility of farming activities on the fields.

### B.  Satisfying the Criteria for Wetlands Determination

Next, Ms. Boucher argues that Fields Un1 and Un2 do not meet the criteria for hydrology and hydrophytic vegetation and therefore do not qualify as wetlands. In order for land to be labeled a wetland, it must have all three of the following characteristics: (1) a predominance of hydric soil, (2) hydrology sufficient to support a prevalence of hydrophytic vegetation typically adapted for saturated soils, and (3) prevalence of hydrophytic vegetation. Ms. Boucher acknowledges that the fields had hydric soils. The evidence from soil maps, soil samples, and field observations supports this finding.

However, Ms. Boucher asserts that there is no evidence of sufficient hydrology and hydrophytic vegetation on Fields Un1 and Un2 to support a finding that the fields are wetlands. She explains that no hydrophytic vegetation actually exists on Fields Un1 and Un2, and none of the indicators for wetland hydrology are actually present on Fields Un1 and Un2. Because hydrology and hydrophytic vegetation are not actually present on Fields Un1 and Un2, these fields should not be considered wetlands or converted wetlands. Ms. Boucher also asserts that the fields do not contain wetland hydrology either because the fields were drained prior to 1985 or because the fields never contained wetland hydrology.

In contrast, NRCS's evidence indicates that Fields Un1 and Un2 had been cleared, drained, and cropped, which necessitated the use of a comparison or reference site to determine the fields' characteristics in their natural state. An atypical situation data sheet was completed for the comparison site. NRCS's data forms for the January 2013 field visit indicated that the recent heavy rains were taken into consideration. Field 7 was utilized as the comparison site for Fields Un1 and Un2, and the results of the analysis indicated that three primary indicators and two secondary

indicators of wetland hydrology were present. Additionally, the photographs from the January 2013 field visit show surface water present on Fields Un1 and Un2.

Because the natural vegetation had been removed from Fields Un1 and Un2, NRCS utilized Field 7 as a comparison site to determine the vegetation on the fields had manipulation not occurred. The natural vegetation on Field 7 was similar to the vegetation that had been removed from Fields Un1 and Un2, and the existing vegetation included plants, shrubs, and trees that were identified on the National Wetland Plant List. Having determined a prevalence of hydrophytic vegetation existed on Field 7, NRCS also determined that hydrophytic vegetation existed on Fields Un1 and Un2 prior to Mr. Boucher's removal of the vegetation.

NRCS followed the required regulatory procedures when land has been manipulated to determine whether wetlands existed on the Property. The evidence indicates that the appropriate technical manuals were used and followed, and NRCS completed the necessary wetland determination data forms and atypical situation data sheet to document and support its work and findings. The evidence supports USDA's administrative decision regarding the existence of the three wetland criteria on Fields Un1 and Un2 using a comparison site.

### C.  Using Field 7 as the Comparison Site for Fields Un1 and Un2

Ms. Boucher alleges that Field 7 was improperly used as the comparison site for Fields Un1 and Un2 and that Field 8 would have been a more appropriate comparison site. To support this assertion, Ms. Boucher argues that the area comprising Field 7 is and has remained forested and overgrown with brush. The areas comprising Fields Un1 and Un2 are not forested and contain grass-like plants and only a few trees. The back of Field 8 contains grassy vegetation and sparse trees more similar to Fields Un1 and Un2.

The Code of Federal Regulations directs that "[i]n the event the vegetation on such land has been altered or removed, NRCS will determine if a prevalence of hydrophytic vegetation typically exists in the local area on the same hydric soil map unit under non-altered hydrologic conditions." 7 C.F.R. § 12.31(b)(2)(ii).

Field 7, Field 8, and Fields Un1 and Un2 are at the same elevation within inches. These fields are within the same local area, each being neighboring fields on the same Property. The fields are on the same hydric soil map. Under the regulations and manuals, either Field 7 or Field 8 properly could have been used as the comparison site for Fields Un1 and Un2. Ms. Boucher would have used Field 8. USDA's field experts chose to use Field 7.

USDA explains that it chose Field 7 as the comparison site because it provided the best picture of the land's natural state before alterations and manipulations were made to the land. Field 7 contained vegetation similar to the vegetation that was removed from Fields Un1 and Un2. The fields were on the same hydric soil map, and Field 7 was just south of Field Un2 and just west of Field Un1. In contrast, Field 8 was the original homestead where a barn, a house, and fences were located. Field 8 had been manipulated and farmed, making it more similar to Fields Un1 and Un2 after their manipulation, but making it less helpful to determine the fields' natural, unmodified condition.

As the Director of USDA's National Appeals Division noted in his appeal decision, the purpose of using a comparison site is to determine the natural condition of the land before any manipulations have been made. Thus, the comparison site should be similar to the site under consideration, but it need not be identical. The Director noted that NRCS decided Field 8 was not a good comparison site to determine the natural condition of Fields Un1 and Un2 because it had been disturbed or altered like Fields Un1 and Un2, whereas nearby Field 7 had not been disturbed

or altered, allowing it to provide a better picture of the natural state of the fields. This explanation is not arbitrary and does not lack substantial support in the evidence. Field 7 was a proper comparison site to determine wetland characteristics for Fields Un1 and Un2.

Ms. Boucher also argues that NRCS's field visit in January 2013 to analyze Fields 7, 8, Un1, and Un2 was not conducted during the normal growing season and under normal circumstances, making the field visit and the resulting determination invalid. She emphasizes the heavy snow and rainfall preceding the site visit and that January is not the normal growing season for Indiana. She also points out that the Code of Federal Regulations directs on-site determinations to be made when site conditions are favorable for the evaluation of soils, hydrology, or vegetation.

USDA responds that the rules and regulations do not require site visits to be made during the normal "growing season," and "normal circumstances" does not refer to normal climate conditions but rather refers to the soil and hydrologic conditions that are normally present without regard to the removal of any vegetation.

Indeed, the rules and regulations do not require that site visits occur during the growing season. In fact, wetland determinations can be made without any site visit by using off-site tools and criteria. USDA is permitted to conduct site visits throughout the entire year and uses procedures and indicators to adjust their findings to reflect normal circumstances. USDA's technical manuals anticipate that site visits will not always occur during ideal field conditions and provide guidance for such situations. In this case, the wetland determination data sheets noted the heavy rainfall that had occurred just before the field visit to the Property. The evidence shows that NRCS accounted for the less than ideal field conditions when making the wetlands determination. Accordingly, the decision was not arbitrary or capricious, beyond statutory authority, or without evidentiary support.

### D.  Failing to Timely Finalize Mr. Boucher's 2003 Appeal

Lastly, Ms. Boucher argues that USDA's failure to timely address and finalize Mr. Boucher's 2003 appeal should invalidate its 2013 determination. She explains that while no specific time limitations to process an appeal are placed upon USDA by the Food Security Act, the Code of Federal Regulations provides that "[a]n on-site determination, where applicable, will be made by the NRCS representative as soon as possible following a request for such a determination, but only when site conditions are favorable for the evaluation of soils, hydrology, or vegetation." 7 C.F.R. 12.6(c)(7). Ms. Boucher additionally asserts that due process demands an opportunity to be heard at a meaningful time and in a meaningful manner, timely and adequate notice, and an opportunity to confront witnesses and present evidence, relying on *Goldberg v. Kelly*, 397 U.S. 254, 267–68 (1970).

Ms. Boucher asserts that she was denied due process by the delay between the 2003 preliminary determination and the 2013 final determination. She argues that she was prejudiced by the delay because Mr. Boucher died in the interim and therefore was not available to provide testimony during the 2013 administrative proceedings. Not only had Mr. Boucher farmed and been present on the Property since before the passage of the Swampbuster provisions, but he also had personal knowledge of the history of the Property, which could have been used in support of the issues on appeal. Additionally, Roy Hibray, the district conservationist who in 1987 determined hydric soils and potential wetlands were on the Property, also died before the 2013 administrative proceedings. Ms. Boucher believes Mr. Hibray was familiar with the condition of the Property and could have provided testimony in support of her position.

22

In response, USDA argues that it was permitted to abandon or withdraw their 2003 preliminary action, and a decision not to pursue the action to finality in 2003 did not have preclusive *res judicata* effect or preclude USDA from taking later action when it received a new and separate request for a wetlands determination. USDA points out that Ms. Boucher cites no legal authority for the argument that, by not pursuing the 2003 preliminary determination to finality, NRCS was somehow barred from taking any future action as to the Property or conducting a new wetlands determination.

USDA notes that the Bouchers were on notice as early as 1987 that hydric soils were on their Property, setting up a potential wetland determination. As USDA farm program beneficiaries, Mr. Boucher and his tenants were responsible for knowing and complying with the regulations governing program eligibility. It was their obligation to ensure program compliance to continue receiving USDA benefits.

USDA further asserts that the 2003 determination was a preliminary determination, which was never finalized. The Bouchers did not suffer any consequences from this action. They did not lose any program benefits because of the 2003 preliminary determination. NRCS then was reminded of the 2003 preliminary determination in 2012 when Mr. Helms, the tenant on the Property, submitted a request to tear down the barn and an old house on the Property. Once the 2013 final technical determination was issued, Ms. Boucher was afforded all of her due process rights during the administrative proceedings to be heard and to present evidence about the 2013 final determination. She participated in the hearing, presented evidence and argument personally and by a representative, and called witnesses.

After reviewing the record, the Court notes that it found no evidence that the Bouchers and their tenants ceased farming operations while the 2003 preliminary determination was "pending"

on appeal. There is no evidence that their activities were affected at all. In fact, the record indicates that farming operations did continue on the Property. The evidence suggests that USDA farm program benefits continued to be provided to the tenants conducting farming operations on the Property. Therefore, there was no deprivation of any rights leading up to the 2013 final determination.

The Court also recognizes that there was not a delay in a decision-making process for providing benefits to the Bouchers. The ten-year delay did not leave the Bouchers without benefits to which they were entitled or which they were anticipating. They already were receiving USDA farm program benefits. Rather, the decision-making process involved a wetlands determination, which eventually could lead to ineligibility for benefits.

When the final determination was issued for the Property, Ms. Boucher was provided due process to challenge the administrative action. She participated in the administrative hearings. She presented evidence and argument personally and by a representative. She also called witnesses.

Concerning the unavailability of Mr. Boucher and Roy Hibray as witnesses because of their deaths, it is speculative to assert what their testimony would have been at the hearings. Roy Hibray was a district conservationist, and he determined in 1987 that hydric soils (and potentially wetlands) were on the Property. Contrary to Ms. Boucher's assertion, it is not likely that Mr. Hibray would have provided testimony in support of her position. The only evidence provided by Mr. Hibray leads to a wetland determination. While Mr. Boucher could have possibly testified about the installation of drainage tiles on the Property, the evidence presented showed that tiles were not located in Fields Un1 and Un2, and the administrative hearing officer still would have had to weigh the evidence and make a determination. Mr. Boucher (and Ms. Boucher) admitted to removing trees from Fields Un1 and Un2. Thus, the administrative decision still would have been

24

supported by evidence because of the finding of no drainage tiles, the admission of removing trees, and the existence of wetland characteristics on the comparison site. As noted, the Court does not reweigh the evidence when reviewing an administrative decision.

The Court finds that the passage of time between the 2003 preliminary determination and the 2013 final determination did not deprive Ms. Boucher of her due process rights. This is true even with the passing of Mr. Boucher and Roy Hibray. She was not deprived of any benefits or rights by the 2003 preliminary determination, and she was given a meaningful opportunity at a meaningful time to present evidence, testimony, and argument and to confront adverse witnesses in response to the 2013 final determination.

### E.  <u>Determination that Field 7 is a Wetland</u>

In the concluding paragraph of her summary judgment briefs, Ms. Boucher asks the Court to vacate the Field 7 wetland determination and remand the case to USDA with instructions to find that Field 7 is not a wetland. However, Ms. Boucher advances no arguments, evidence, or legal authority in her summary judgment briefing to support such a request. When she discusses Field 7 in her briefs, it is only in the context of arguing that Field 7 was an improper comparison site for Fields Un1 and Un2. At the very end of her reply brief, Ms. Boucher inserts a footnote and claims that the Field 7 argument is included as part of her due process argument. The due process issue is discussed in the previous section and will not be repeated here. The Court notes that in each of Ms. Boucher's summary judgment briefs she acknowledges that "Field 7 plainly contained wetland characteristics." (<u>Filing No. 45 at 24</u>; <u>Filing No. 51 at 15</u>.) The evidence presented during the administrative proceedings and to the Court as part of the record supports Ms. Boucher's concession that Field 7 plainly contained wetland characteristics. This determination will not be disturbed on judicial review.

## V.   CONCLUSION

As noted in the standard of review section of this order, on review, the district court does not reweigh the evidence and the review is narrow and highly deferential. Even if the Court disagrees with the agency's action, it must uphold the action of the agency if the agency considered all of the relevant factors and a rational basis for the agency's decision can be discerned. For the reasons stated herein, Plaintiff Rita Boucher's Motion for Summary Judgment (Filing No. 44) is **DENIED**, and Defendants United States Department of Agriculture and Tom Vilsack's Cross-Motion for Summary Judgment (Filing No. 48) is **GRANTED**. Ms. Boucher's request for costs and attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, is **DENIED**.

Final judgment will issue under separate order.

**SO ORDERED.**


Date: 2/26/2016

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Eric N. Allen
ALLEN WELLMAN MCNEW
ena@awmh.net

Michael C. Cooley
ALLEN WELLMAN MCNEW
mcc@awmh.net

Shelese M. Woods
UNITED STATES ATTORNEY'S OFFICE
shelese.woods@usdoj.gov